Sharon L. NICHOLS and David R. Nichols, Virginia Ann Callan and Charles Oliver Richardson, III, Marilyn Goodman and Thomas J. Goodman, Debra A. Lopez and Rudolph Lopez, Sharon Ruth Anderson, Rosemary Madrid Castaneda and Jesse Castaneda, Karen Ley–Lloyd, Jacqueline Templin, Katherine Galati Novick, Karen Janet Davis, Peggy Lee Patterson, Michelle James, Patricia Ann Ehlert, Dana Messerly and Raymond Leroy Messerly, Susan Gail Parlon, Alicia Roberts, Lindsy Gail Syroid, Barbara Ruth Ames, Susan Partridge and David Partridge, Ruby Caroline Larabie, Deanna H. Robb, Carmen Callier, Anna Caruso, Cynthia Isabelle and Jean Claude Isabelle, Nancy Delsanto and James Delsanto, Barbara Hayden and Norman Hayden, Deborah Ann Muscato, Stoina Hibbard and Michael Hibbard, Denise K. Liberman, Gayle E. Donnelly, Martha Caust–Moran and Pascal Moran, Roberta Walls and Charles Walls, Linda Phillips, Susan Lee Smirl Krupa, Karen Prewitt, Janet Rae Fregonese, Wanda S. McAlister, Tamara M. Felix, Felicitas L. Singer and Thomas J. Singer, Nicole Cohen Blair, Mary Ina Delisle Courville and George Vincent Courville, Prisuave Walker and Mark Dale Walker, Gail R. Zucker and Kenneth Jay Wolf, Roberta Fryer, Sharon P. Loftus and Michael J. Loftus, II, Janet Lynn Billings, Julia Mae Lambert Thaxton, Pauline Johnson, Catherine Evans, Cheryll Smith and Michael Smith, Nancy Daru Yaeli and Ron Thomas Yaeli, Barbara Helm–Gottsleben, Harriet Birnbaum Helberg and Sandy Morris Helberg, Nancy Frisch and Paul Frisch, Linda Jo McCarver and Byron Marvin McCarver, Sandra Carol Smith and Joseph James Smith, Debbie Dolores Stallings and John Francis Stallings, Jr., Carol A. Lofquist Cummins and Dirk P. Cummins, Lilyan Chrappa–Spool and Roger Owen Spool, Bonnie Eugenia Crownover and George Donald Crownover, Jr., Joyce Elaine Andrew–Lavage and William Michael Andrew–Lavage, Cynthia Corrine Hand and Michael Joseph Tracy, Monica Gay Ward, Cheryl Jane Gerhart and Ronald Scott Gerhart, Cindy Fohn Coleman and Kyle Howard Coleman, Janet Stein, Catherine Susan LaRosa, Sandra Lynn Pusep, Nancy Peeler Sheehan and Charles M. Sheehan, Irene Sylvia Angelico and Abbey Jack Neidik, Elsie Espana and Elio Espana, Gayle Peterson

v.

G.D. SEARLE & COMPANY and Searle Pharmaceuticals, Inc.

Civ. Nos. B–87–985, B–87–1312, B–87–2107, B–87–2473, B–87–3172 to B–87–3174, B–88–371, B–88–1190, B–88–2496, B–88–2937, B–88–3235, B–88–3605, B–88–3942, B–89–15, B–89–50, B–89–127, B–89–128, B–89–255, B–89–259, B–89–305 to B–89–308, B–89–618, B–89–696, B–89–792, B–89–793, B–89–794, B–89–848 to B–89–850, B–89–1335, B–89–1529, B–89–1934 to B–89–1937, B–89–2579, B–89–2583, B–89–2671, B–89–2672, B–89–3093, B–89–3133, B–89–3460, B–90–341, B–90–491, B–90–651, B–90–654, B–90–715, B–90–1227, B–90–1488, B–90–1715, B–90–1969, B–90–2244, B–90–2298, B–90–2593, B–90–3121, B–91–570, B–91–587, B–91–640, B–91–689, B–91–908, B–91–1035, B–91–1324, B–91–1486, B–91–1512, B–91–1526, B–91–1612, B–91–1807, B–91–1808 and B–91–1820.

United States District Court, D. Maryland.

Jan. 22, 1992.

H. Robert Erwin, Jr. and Pamm G. Wiggin, Baltimore, Md., and Roger L. Pardieck, Seymour, Ind., for plaintiffs.

Paul F. Strain, Elizabeth C. Honeywell and James L. Shea, Baltimore, Md., for defendants.

WALTER E. BLACK, Jr., Chief Judge.

Presently pending before the Court are defendant's Motions for Rule 12(d) Preliminary Hearing on its Defense of Lack of Personal Jurisdiction. Beginning in 1983, more than one hundred female plaintiffs began to file products liability claims in Maryland against G.D. Searle & Company and Searle Pharmaceuticals, Inc. (collectively referred to as "Searle"). Each plaintiff alleges that she was injured due to use of Searle's Copper–7 device, a contraceptive product.

To support a finding of personal jurisdiction, plaintiffs contend that Searle, a non-resident defendant, has certain contacts with the State of Maryland. In particular, plaintiffs claim that their cause of action arises directly out of two Searle activities in the state: its testing of Copper–7 and its fraudulent reports to the Food and Drug Administration ("FDA"), which is located in Maryland. Plaintiffs also assert that jurisdiction may be based on Searle's continuous business presence in Maryland, even though this contact is unrelated to the underlying dispute.

In opposition, Searle filed the present motion in 72 separate actions. Although the motion formally seeks a preliminary hearing, defendant actually moves this Court to dismiss these actions for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. As a general matter, defendant asserts that Maryland has no connection to these proceedings because the parties are non-residents and the alleged injury was not caused or suffered here. Moreover, defendant accuses plaintiffs of forum-shopping.[1]

In light of the fact that the parties have already presented oral argument at a hearing in open court, the Court turns its attention to the complex issues relating to dismissal.

Once a defendant has raised a 12(b)(2) defense, the plaintiff has the burden of proving the factual basis necessary to support this Court's exercise of *in personam* jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *United Merchants & Mfrs., Inc. v. David & Dash, Inc.*, 439 F.Supp. 1078, 1081 (D.Md.1977). The plaintiff must sustain its burden of proof through sworn affidavits or other competent evidence. *See Wessel Co. v. Yoffee & Beitman Management Corp.*, 457 F.Supp. 939, 940 (N.D.Ill.1978). In the event of a dispute between the affi-

---

1. To support this accusation, defendant points to a case filed jointly by the same plaintiffs' counsel on behalf of fifty-seven out-of-state plaintiffs on June 28, 1991—*Amos, et al. v. G.D. Searle*, Civil No. B–91–1818. Three days later, section 5–115(b) of Md.Cts. & Jud.Proc.Code Anno. took effect. This section provides:

    If a cause of action against a manufacturer or seller of a product for personal injury allegedly caused by a defective product arose in a foreign jurisdiction and by the laws of that jurisdiction the cause of action may not be maintained by reason of lapse of time, an action may not be maintained in this State, except in favor of one who is a resident of this State.

    Defendant therefore asserts that plaintiffs, knowing of their stale claims in other jurisdictions, rushed to take advantage of Maryland's generous statute of limitations before it was too late.

davits offered by the opposing parties, the Court is obligated to resolve the conflict in the light most favorable to plaintiff. *Id.*

When sitting in diversity, a federal court has the authority to exercise personal jurisdiction over a non-resident defendant if 1) an applicable state "long-arm" statute confers jurisdiction and 2) the assertion of that jurisdiction comports with the constitutional requirement of due process. *Blue Ridge Bank v. Veribanc, Inc.,* 755 F.2d 371, 373 (4th Cir.1985); *Bowman v. Curt G. Joa, Inc.,* 361 F.2d 706, 711 (4th Cir.1966). With respect to the first factor, the Court is bound by the interpretations and rulings of the Maryland state courts. Federal law, however, governs the second. *Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745, 747 n. 3 (4th Cir.1971); *Pulson v. American Rolling Mill Co.,* 170 F.2d 193, 194 (1st Cir.1948).

The applicable state statute, section 6–103 of Md.Cts. & Jud.Proc.Code Ann., provides the following:

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State; or

. . . .

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

. . . .

Although subsection (a) appears to indicate that a plaintiff may only sue a non-resident defendant for an act arising out of a Maryland contact, the courts have refused to extend the language to control subsection (b)(4). *Geelhoed v. Jensen,* 277 Md. 220, 232, 352 A.2d 818 (1976); *Greenwood v. Tides Inn, Inc.,* 504 F.Supp. 992, 996 (D.Md.1980). Instead, subsection (b)(4) does not require that a defendant's contacts bear any relationship to the alleged acts giving rise to the suit. *Geelhoed,* 277 Md. at 232, 352 A.2d 818. Where there is no relationship, however, the defendant's contacts to the forum must be "extensive, continuous, and systematic." *Goodyear Tire & Rubber Co. v. Ruby,* 312 Md. 413, 422–423, 540 A.2d 482 (1988).

In adopting this long-arm statute, the Maryland legislature expanded *in personam* jurisdiction to the limits allowed by the U.S. Constitution. *Geelhoed,* 277 Md. at 224, 352 A.2d 818. *See also A.S.C. Leasing, Inc. v. Porter,* 651 F.Supp. 384, 385 (D.Md.1987). Therefore, federal law provides valuable guidance in interpreting the statute. In addition, the Court must rely on federal law in conducting the second half of a jurisdictional analysis: assessing the extent to which the exercise of personal jurisdiction accords with due process. *Ratliff,* 444 F.2d at 747 n. 3.

Under the U.S. Constitution, the Due Process Clause of the Fourteenth Amendment protects defendant's "liberty interest in not being bound *in personam* by judgments of a forum with which [defendant] lacks meaningful contacts, ties or relations." *First American First, Inc. v. National Ass'n of Bank Women,* 802 F.2d 1511, 1515 (4th Cir.1986). To safeguard this liberty, the Supreme Court has required that defendant have certain "minimum contacts" with the forum state such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In essence, defendant's "conduct and connection with the forum State [must be] such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

A court is duty-bound to treat this jurisdictional analysis with the seriousness deserving of constitutional questions. Indeed, a finding of personal jurisdiction should not turn on hollow distinctions with precedent or on a mere counting of contacts. The U.S. Supreme Court specifically spoke to this point in *International Shoe:*

> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less.... Whether due process is satisfied must depend rather upon the *quality and nature* of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.

(emphasis added) 326 U.S. at 319, 66 S.Ct. at 159–160. Despite the passage of forty-six years, this observation still rings true.

The Supreme Court has recently refined its approach to jurisdictional analysis by distinguishing the exercise of "specific" and "general" jurisdiction. "Specific jurisdiction" is conferred on a court when a cause of action arises out of defendant's minimum contacts to the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The justification for such a low threshold of contacts is simple. When a defendant purposefully targets its conduct to cause harm in a forum state, it can reasonably expect to be haled into that state's courts. Thus, even a single contact may be sufficient to create jurisdiction, provided that the principle of "fair play and substantial justice" is observed. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–478, 105 S.Ct. 2174, 2184–2185, 85 L.Ed.2d 528 (1985); *First American First,* 802 F.2d at 1516.

When the cause of action is unrelated to defendant's contacts, however, a court may only exercise jurisdiction upon a showing that defendant's contacts are of a "continuous and systematic" nature. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873; *First American First,* 802 F.2d at 1516. This "general jurisdiction" standard ensures that defendant has a sufficient connection to the forum. In addition, the standard enables the forum to impose upon defendant the obligations as well as the privileges of maintaining continuous contacts.

As already stated, plaintiffs in the immediate case seek to establish jurisdiction based on defendant's specific and general contacts. In terms of specific jurisdiction, plaintiffs rely on Searle's research activities and its fraudulent reports to the FDA. As a matter of general jurisdiction, plaintiffs point to Searle's efforts to advertise and solicit pharmaceutical and consumer products. In evaluating these contacts, this Court follows the lead of the Supreme Court in *Helicopteros,* which considered as relevant the contacts that existed prior to the occurrence of actionable conduct. 466 U.S. at 409–417, 104 S.Ct. at 1869–1874. *See also McLaughlin v. Copeland,* 435 F.Supp. 513, 527 (D.Md.1977) (construing § 6–103(b)(4) of Maryland's long-arm statute).

*General Jurisdiction*

■ Due to the complexities of the specific contacts in this case, the Court shall first direct its attention to the question of general jurisdiction. Plaintiffs allege that Searle has established general contacts in Maryland by its advertising efforts and its use of representatives for promoting products and soliciting orders.[2] Between the years 1980 and 1987 (when the plaintiffs relevant to this motion began to file suits), Searle placed in Maryland as many as 17 to 21 employees, 13 of whom were residents. These employees tended to fall into two categories: pharmaceutical representatives and consumer goods representatives. A

---

**2.** The Court draws its facts primarily from the supporting materials submitted by plaintiffs. The occasional ambiguity in the Court's fact presentation is in part due to omissions in the record.

pharmaceutical, or "detail," representative was responsible for promoting the use of Searle's pharmaceutical products by physicians, hospitals, and wholesalers. A consumer goods representative sought to convince clients to purchase such well-known Searle brands as Metamucil, Equal, and Dramamine.

For the pharmaceutical line, the record shows that Searle had employed 12 detail representatives and one district manager, each of whom was responsible for promoting pharmaceutical products in Maryland. A detail representative was typically interviewed and hired in Maryland. Throughout the course of employment, Searle provided its representatives with automobiles and reimbursed for work-related phone calls. Additionally, each representative was equipped with a supply of pharmaceutical samples and promotional materials.

While each of these detail representatives conducted some business in Maryland, at least seven performed all their duties here. On their visits to doctors, hospitals, pharmacies, and wholesalers, the detail representatives distributed promotional materials and encouraged their clients to prescribe Searle products to patients. To coordinate these employees, Searle held district meetings in Maryland three times a year and scheduled further meetings on an as-needed basis.

With respect to consumer goods, Searle had employed in Maryland at least five representatives and one district manager. These employees took orders directly from retail stores in Maryland and phoned these orders in to an 800 telephone number. In addition, these representatives provided layouts for local retail advertisements and covered the costs of publication. As in the case of detail representatives, Searle provided its consumer products employees with automobiles and samples of products.

Defendant Searle has accumulated revenue from its business activities in Maryland. In 1983 and 1984, when the Copper–7 device was marketed, total revenues reached 12.1 million dollars and 13 million dollars, respectively. After the Copper–7

device was withdrawn from the market, Searle collected 9 million dollars in 1986, 10 million dollars in 1987, 9.8 million dollars in 1988, 12.7 million dollars in 1989, and 12.9 million dollars in 1990.[3]

In considering whether to exercise general jurisdiction, the Court acknowledges the importance of focusing on the quality and nature of the contacts. Thus, the Court will resist the temptation merely to count the contacts and quantitatively compare this case to other preceding cases.

The Fourth Circuit provided apt guidance on this point in *Ratliff v. Cooper Laboratories, Inc.*, 444 F.2d 745 (4th Cir.1971), *cert. denied*, 404 U.S. 948, 92 S.Ct. 271, 30 L.Ed.2d 265 (1971). In *Ratliff*, the court reviewed the extent to which South Carolina had jurisdictional ties to two drug manufacturers sued on product liability grounds. *Id.* at 746. As a preliminary matter, South Carolina was neither the residence of the plaintiffs nor the situs of the cause of action. The case was therefore ripe for analysis under the "general" contacts standard despite the fact that *Helicopteros* was not decided until thirteen years later.

One manufacturer, Cooper Laboratories, limited its South Carolina contacts to the mailing of solicitations to dealers and wholesalers and the mailing of promotional literature to doctors. *Id.* The other manufacturer, Sterling Drug, had more extensive ties. In addition to registering to do business in South Carolina and appointing an agent for service of process, Sterling maintained five detail representatives "who live in South Carolina and promote Sterling's products through personal contacts with doctors and drugstores throughout the state." *Id.* The court also acknowledged that these employees occasionally took orders themselves.

After conducting a thorough due process analysis, the Fourth Circuit evaluated the possible bases for exercising jurisdiction over the defendants. The court found little support for jurisdiction:

**3.** The record does not provide the revenue figures for 1985 and 1991.

Neither [manufacturer] maintains an office in South Carolina, and neither warehouses goods there. With the exception of the samples and materials used by Sterling's detail men, neither has any real or personal property in the state. Nor does either maintain a bank account in the state or advertise in directories there (although advertisements do appear in national medical journals which subsequently find their way into the state). The presence of Sterling's detail men in South Carolina and the appointment of an agent for service of process in accordance with South Carolina law does not, we think, tip the scale for plaintiff....

*Id.* at 748.

With special relevance to advertising and solicitation, the Fourth Circuit compared the *Ratliff* facts to the First Circuit decision of *Seymour v. Parke, Davis & Co.*, 423 F.2d 584 (1st Cir.1970). Indeed, the Fourth Circuit characterized *Seymour* as "a case of remarkable similarity to the one before us." 444 F.2d at 748. In *Seymour*, a resident of Massachusetts brought an action in New Hampshire for the manufacture of an allegedly harmful drug by Parke, Davis & Company, a Michigan corporation. 423 F.2d at 585. The claim did not arise out of defendant's activities in New Hampshire.

The defendant in *Seymour* maintained no offices, manufacturing plants, or bank accounts in New Hampshire. *Id.* As in *Ratliff*, the quality of defendant's actual contacts involved advertising and solicitation. Approximately six salespeople, most of whom were forum residents, performed this solicitation by visiting physicians, retailers, and hospitals in order to promote the product and take orders. *Id.* No employee had the authority to enter into a contract or deliver goods other than samples. After soliciting, the salespeople simply forwarded the orders to Massachusetts.

The First Circuit found no personal jurisdiction based on the following rationale:

If the plaintiff has some attachment to the forum, or if the defendant has adopted the state as one of its major places of business, we would have no question of the right of the state to subject the defendant to suit for unconnected causes of action. Nor would we even if the forum were not a major center of defendant's business but were nevertheless a community into whose business life the defendant had significantly entered as determined by the quality, substantiality, continuity, and systematic nature of its activities.... *When, however, defendant's only activities consist of advertising and employing salesmen to solicit orders, we think that fairness will not permit a state to assume jurisdiction.*

*Id.* at 587. (Emphasis added).

The Fourth Circuit approvingly quoted this very passage in *Ratliff.* 444 F.2d at 748. With explicit reliance on the language and logic of the First Circuit, the *Ratliff* court similarly held that South Carolina lacked a sufficient nexus to justify the exercise of personal jurisdiction. *Id.* at 748–749.

The holding in *Ratliff* is the law today, even though the Supreme Court decision in *Helicopteros* intervened to distinguish "specific" and "general" jurisdiction. For all intents and purposes, the Fourth Circuit anticipated this distinction. For example, in confronting an action unrelated to the forum, the Fourth Circuit stressed that defendant's contacts must be substantial, continuous, and systematic. 444 F.2d at 748. This standard clearly comports with the subsequent holding of *Helicopteros.*

The continuing viability of the *Ratliff* holding is not only due to its logical consistency with *Helicopteros*. *Ratliff* is also relevant today because a recent First Circuit decision has found that the *Seymour* case is a sound application of *Helicopteros.* This particular case, *Glater v. Eli Lilly & Co.*, 744 F.2d 213 (1st Cir.1984), therefore indirectly supports the proposition that the Fourth Circuit's approach is compelled by *Helicopteros.*

In *Glater*, the First Circuit reviewed the decision of a New Hampshire District Court to dismiss an action for lack of personal jurisdiction. The lawsuit involved the

claim of a Massachusetts resident against Eli Lilly & Co. ("Lilly") for personal injuries allegedly caused by exposure *in utero* to diethylstilbestrol ("DES"), a drug manufactured by Lilly. 744 F.2d at 214. The relevant jurisdictional facts are best summarized by the First Circuit:

> Lilly is an Indiana corporation which has marketed DES nationwide since 1947. Lilly engages in limited advertising of its pharmaceutical products in professional trade journals which circulate in New Hampshire, and employs eight sales representatives whose duties consist in part of providing information concerning Lilly products to certain New Hampshire physicians, pharmacies and hospitals. Three of the sales representatives live in New Hampshire. Neither the sales representatives nor Lilly directly sells products in New Hampshire; rather, sales are made to individual wholesale distributors, some of whom are located in New Hampshire.

*Id.* at 214–15. Because the quality of these contacts invoked the facts of *Seymour*, the First Circuit found that the district court properly relied on *Seymour* to dismiss the action. Therefore, the plaintiff failed to justify the court's exercise of general jurisdiction.

The controlling standard for the case at bar is therefore found in the above precedents. Fundamentally, the Court is instructed to first determine the quality and substance of Searle's contacts. If Searle's connection to Maryland lies only in its limited advertising and solicitation, the Court will be unable to find a basis for general jurisdiction.

It is clear to this Court that advertising and solicitation constitute the essence of Searle's association with Maryland. Of course, Searle does have more detail representatives than Cooper Laboratories, Sterling Drug, Parke Davis, and Lilly. In addition, the instant record shows that Searle provides automobiles, a factor apparently missing from precedents.[4] Nonetheless, the limited acts of advertising and solicitation fully constitute the quality and nature of Searle's contacts.[5] As instructed by the Fourth Circuit in *Ratliff,* this Court thus finds itself unable to exercise its personal jurisdiction on the basis of general contacts.

To hold otherwise would reduce an important due process analysis to a mechanical "splitting of hairs." If a court simply focused on the quantity of contacts, a defendant would risk being treated different-

---

**4.** Obviously, the Court can only compare its facts to those found relevant by the courts in *Ratliff, Seymour,* and *Glater.* Indeed, these appellate courts may have omitted some facts believing them to be encompassed by such broad terms as "solicitation" and "advertising." This problem of inadequate comparison thus reinforces the notion that the Court should look at the quality and nature of the contacts, not the quantity. Because Searle's provision of automobiles directly relates to its solicitation efforts, the Court will not regard these automobiles as additional contacts.

**5.** Plaintiffs contend that Searle's substantial revenue provides an additional qualitative contact to Maryland. If the Court were to adopt this position, it would immediately conflict with case law. In *Lee v. Walworth Valve Co.,* 482 F.2d 297, 299–301 (4th Cir.1973), the Fourth Circuit exercised the pre-*Helicopteros* equivalent of general jurisdiction over a defendant whose contacts consisted of generating sales activity and substantial revenue. Although appearing to consider revenue as relevant, the court indicated that it would not have upheld jurisdiction had the plaintiff been a non-resident and had there been the taint of forum shopping—as in the *Ratliff* case. Thus, in the eyes of the Fourth

Circuit, revenue represents merely an additional—if not superfluous—factor in support of jurisdiction.

A recent decision in the District of Columbia used *Lee* and *Ratliff* to further diminish the relevance of revenue in a general jurisdiction analysis. That decision, *Hughes v. A.H. Robins Co., Inc.,* 490 A.2d 1140, 1151 (D.C.App.1985), held that "when the cause of action is unrelated to any corporate activity in the forum, ... revenues cannot be deemed 'substantial' within the meaning of *International Shoe.*" In addition, the decision drew a lesson from *Ratliff.* The *Ratliff* court never mentioned revenues, even though it

> surely must have been aware that one of the two defendants, Sterling Drug Company, was one of the leading drug manufacturers in the nation and undoubtedly derived considerable revenue from sales of its products in South Carolina.

*Hughes,* 490 A.2d at 1151. Based on the deemphasis of revenue in *Lee, Ratliff,* and *Hughes,* this Court must conclude that plaintiffs cannot rely upon revenue alone to draw Searle into Maryland.

ly based on a judge's superficial impression that the presence of 15 detail representatives—rather than 8—is sufficient to confer jurisdiction. Such arbitrariness would directly undermine the promise of the due process clause.[6]

### Specific Jurisdiction

■ The Court now turns its attention to evaluating Searle's specific contacts. To reiterate, a court may exercise specific jurisdiction when a cause of action arises out of defendant's minimum contacts to the forum. In this case, plaintiffs contend that their lawsuit relates to two Searle activities in Maryland: its research and testing and its allegedly fraudulent reports to the FDA, which is located in Maryland.

■ Regarding the research contact, plaintiffs have presented uncontroverted evidence that Searle engaged in animal and clinical testing in the 1970s. From 1971 to 1972, Searle employed Litton Bionetics in Bethesda to perform research on the implantation effects of Copper–7 in rhesus monkeys. From 1970 to 1976, Searle obtained the services of seven doctors to conduct clinical studies.

This use of Maryland's research industry, plaintiffs allege, produced the requisite contact out of which arose plaintiffs' causes of action—negligence, inadequate warning, and strict liability. However, no mere contact can support personal jurisdiction. As the Supreme Court instructed in

*Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2184 n. 18,

> "some single or occasional acts" related to the forum may not be sufficient to establish jurisdiction if "their nature and quality and the circumstances of their commission" create only an *"attenuated"* affiliation with the forum.

(emphasis added). In essence, the exercise of jurisdiction must be reasonable, *Olsen by Sheldon v. Government of Mexico,* 729 F.2d 641, 649 (9th Cir.1984), *cert. denied,* 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984),[7] and not offend "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158.

Applying these principles, the Court concludes that the exercise of personal jurisdiction in this case would be unreasonable because defendant's research activity constitutes an attenuated link to the genuine causes of action. For example, plaintiffs have presented no evidence that these tests themselves were in any way inadequate or pertinent to the negligent manufacture of Copper–7. In addition, Maryland's doctors conducted only 7 out of the 200 clinical studies.[8] The Court therefore finds no justification for forcing defendant to defend in this forum based exclusively on its clinical and animal studies.

■ At oral argument, plaintiffs introduced fraud on the FDA as a specific contact, a contention they failed to raise in their responses opposing defendant's motion.[9] Because of plaintiffs' failure to pro-

6. Plaintiffs' sole reliance on *In re Dalkon Shield Litigation,* 581 F.Supp. 135 (D.Md.1983), is misplaced. In particular, plaintiffs believe personal jurisdiction is compelled in the case at bar because the court in *Dalkon Shield* deemed venue proper for defendants with fewer contacts than Searle. Plaintiffs are wrong on two counts. First, the defendants in *Dalkon Shield* had *more* contacts in that they resided in Maryland and conducted much of the research and development for the Dalkon Shield at Johns Hopkins University Hospital. *Id.* at 138. Second, the *Dalkon Shield* case involved the issue of specific contacts, for which personal jurisdiction is conferred even though the contacts are neither continuous nor substantial.

7. According to the Ninth Circuit, jurisdiction is reasonable where, "under the totality of the circumstances[,] the defendant could reasonably

anticipate being called upon to present a defense in a distant forum." *Olsen,* 729 F.2d at 649.

8. To a lesser degree, both categories of tests could be deemed insufficient because of their antiquated nature.

9. Plaintiffs claim that they provided ample notice of this argument to defendant. Indeed, they did argue this point in Plaintiffs' Opposition to Searle's Motion to Dismiss or to Compel Production of IUD Questionnaires and Reply to Opposition to Motion to Stay filed in *Amos, et al. v. G.D. Searle,* Civil No. B–91–1818, on August 26, 1991. However, as indicated in counsels' joint letter to the Court on September 25, 1991, the October 18 hearing was only intended to involve "the personal jurisdiction motions in

vide adequate notice of this argument, defendant was not properly prepared to respond. Therefore, the Court directed the parties to brief the following issue:

whether the alleged fraud on the FDA, as set forth in oral argument of plaintiffs' counsel, is sufficient to establish specific jurisdiction, either standing alone or in conjunction with the facts relating to clinical trials and animal testing.

Both parties subsequently filed their responses to the Court's direction.

In their complaints, plaintiffs set forth two counts—negligence and fraudulent misrepresentation—that expressly incorporate fraud on the FDA as an element of the action. With respect to the negligence count, plaintiffs allege that defendant defrauded the FDA by providing false, misleading, incomplete and inaccurate information. Plaintiffs' claim of fraudulent misrepresentation is also premised on these FDA reports. For example, as stated in paragraph 52 of the complaint of Karen Ley–Lloyd, Civil No. B–87–3174, "Had defendants furnished their knowledge to plaintiff, the medical community, and the FDA, the plaintiff would not have had the Copper 7 IUD inserted in her body or would have had it removed before her injuries."

Although fraud on the FDA is clearly an element of this case, the question remains whether defendant's contacts with a federal instrumentality located in Maryland is sufficient for this Court to exercise personal jurisdiction. In deciding this issue, the Court finds instructive the "government contact" cases originating from the District of Columbia.

The "government contacts" principle operates to bar the exercise of jurisdiction based only on a defendant's contact with a federal instrumentality. This principle

finds its source in the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire national citizenry. To permit our local courts to assert personal jurisdiction over non-residents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum.

*Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.,* 355 A.2d 808, 813 (D.C.1976) (en banc).

Two years later, a panel of the same court suggested that a defendant's exemption from suit is triggered only when there are First Amendment liberties at stake. *Rose v. Silver,* 394 A.2d 1368, 1373–74 (D.C.1978). In essence, the *Rose* panel limited the broader "free public participation" language of *Environmental Research* to protect only the First Amendment. This narrowed construction may have appeared to conflict with *Environmental Research.* However, the full court denied rehearing the case and failed to reconcile the apparent conflict.[10] In 1990, a panel in *Lex Tex Ltd., Inc. v. Skillman,* 579 A.2d 244, 248 & 249 (D.C.App.1990), revisited the issue and supported the *Rose* position, thus casting further doubt on *Environmental Research.*

At the very least, then, the government contacts rule bars the exercise of personal jurisdiction over a party with a First Amendment interest, such as the right to petition government. This particular right, especially relevant to the immediate case, extends to all departments of the government and includes a party's efforts to advance its commercial or proprietary inter-

---

all cases in Group III, IV, and V, *but not in the Amos case.*" (emphasis added). For the cases relevant to the hearing, plaintiffs never raised the issue of fraud on the FDA as a specific contact. Whether or not defendant had ample notice prior to the hearing, it is clear that the Court did not.

**10.** In *Naartex Consulting Corp. v. Watt,* 722 F.2d 779 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984), the D.C. Circuit noted but found no reason to resolve the tension between *Rose* and *Environmental Research.* Instead, the court concluded that the defendant's contacts, clearly implicating the First Amendment right to petition, fell within the narrower *Rose* interpretation.

ests. *Lex Tex*, at 249 n. 9. However, some exceptions to this rule exist. For example, the court in *Lex Tex* held that the rule does not prohibit suits by a principal against an agent who was hired to petition the government on behalf of the principal. *Id.* at 249–50. In addition, the rule does not preclude jurisdiction over a party engaging in sales to the government. *Siam Kraft Paper Co., Ltd. v. Parsons & Whittemore, Inc.*, 400 F.Supp. 810, 812 (D.D.C.1975), *aff'd*, 521 F.2d 324 (D.C.Cir.1975).

A further and more relevant exception relates to the fraudulent exercise of one's right to petition. Where there are "credible and specific allegations in the district court that the [defendant] had used the proceedings as an instrumentality of the alleged fraud," the government contacts rule does not bar a court from finding personal jurisdiction. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C.Cir. 1983). Although originating from dicta in *Naartex*, this exception properly arises from the rule's exclusive concern with safeguarding the First Amendment. Because fraud is not protected under the First Amendment,[11] the government contacts bar is not triggered. Thus, with respect to Searle, the Court has the power to exercise personal jurisdiction based on fraudulent reports to the FDA.[12]

If the Court were to stop here in its analysis, however, it would undoubtedly expose the courts in Maryland to an unrelenting wave of litigation. For example, without limitation, the fraud exception would produce the following result: whenever a plaintiff has a complaint against a defendant whose only contact to the state is its reports to a federal instrumentality, the plaintiff need only allege fraud to avoid the government contacts bar. This result would surely undermine instead of augment the government contacts rule. Therefore, the Court will only permit the use of this fraud exception where plaintiffs have not merely alleged fraud but have established a prima facie case of fraud.

Such a prima facie requirement is clearly supported by case law. Although "[m]ere averments of jurisdiction are not enough nor may conclusory, unsupported statements contained in the accompanying affidavits be relied upon to demonstrate jurisdiction," *Holfield v. Power Chemical Co., Inc.*, 382 F.Supp. 388, 390 (D.Md.1974), a plaintiff may prove its case by less than a preponderance of evidence. Instead, a prima facie showing is sufficient when a judge relies only upon affidavits and written submissions at a motions hearing. *Farmers Insurance Exchange v. Portage La Prairie Mutual Insurance Co.*, 907 F.2d 911, 912 (9th Cir.1990). A prima facie showing is also allowed when "determination of factual disputes central to the assertion of jurisdiction may be dispositive of questions of liability as well." *Holfield*, 382 F.Supp. at 390. *See also McLaughlin*, 435 F.Supp. at 530. Both of these factors

---

**11.** "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). *See also National Association for Better Broadcasting v. F.C.C.*, 591 F.2d 812, 817–18 n. 33 (D.C.Cir.1978).

**12.** To the contrary, defendant argues that contacts with a multi-state health services agency cannot provide a basis for a state court to assert personal jurisdiction over a foreign defendant. In support, it relies on *Wolf v. Richmond County Hospital Authority*, 745 F.2d 904, 911 (4th Cir.1984), *cert. denied*, 474 U.S. 826, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985). The Fourth Circuit in that case reversed the decision of the U.S. District Court for the District of South Carolina,

which had forced a Georgia hospital to defend a personal injury claim in South Carolina. According to the Fourth Circuit, the Georgia hospital's participation in a health services agency that affected South Carolina did not create a "purposeful, voluntary action in South Carolina."

Defendant attempts to extend the *Wolf* holding to the action before this Court, arguing that the facts of the two cases are virtually identical. Defendant's argument is unfounded. In the instant proceeding, plaintiffs allege that defendant committed a fraudulent act *in Maryland*—the forum state. In *Wolf*, however, the Georgia-based defendant performed no act in South Carolina, the forum state, but merely participated in a health services agency that covers the two states. These facts are hardly analogous.

are present in the case before this Court.[13]

In determining the facts underlying jurisdiction in this case, the Court has significant discretion. As indicated in *Prakash v. American University*, 727 F.2d 1174, 1179–80 (D.C.Cir.1984),

> [t]he court has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction, and normally it may rely upon either written or oral evidence. The court must, however, afford the nonmoving party "an ample opportunity to secure and present evidence relevant to the existence of jurisdiction."

With respect to the pending proceeding, plaintiffs have had ample opportunity to meet their prima facie burden. At the very least, the Court afforded plaintiffs the opportunity to present their evidence and argument on this issue in their memorandum in opposition to defendant's motion to dismiss (which they failed to do), at oral argument, and in their supplemental memorandum on personal jurisdiction. The Court therefore finds that the time is ripe for resolving the question of whether plaintiffs made a prima facie showing of fraud.

Upon review of the evidence, the Court holds that plaintiffs have failed to meet their burden. Of the eleven documents offered to the Court to support the plaintiff's position, not one credibly implies that Searle committed fraud on the FDA. Instead, the documents represent an attempt by the plaintiffs to make Searle amenable to jurisdiction based on speculation and hearsay.

Only six documents even mention the FDA. Of these, the record at best compels an inference that Searle made some mistakes and sacrificed the medical aspects of certain studies. However, there is no evidence that Searle subsequently concealed the mistakes from the FDA. On the contrary, plaintiffs' exhibits indicate that Searle made efforts to periodically update the FDA on changes in research results.[14] In addition, Searle actually advised its staff that the "cooperative approach of the FDA must not be taken as an excuse to provide the Agency with a second-rate submission."

Most significantly, plaintiffs' exhibit 19 reinforces the impression that Searle wished to apprise the FDA of all adverse reactions. In response to an unaffiliated doctor's assertion that Copper–7 increases the likelihood of PID, a member of Searle's staff indicated the following:

> I would suggest that the local physician be advised that she has a professional obligation (and perhaps a legal obligation) to present [any] "evidence" of high infection rates and bad fitting (poorly designed) associated with the Cu–7 to the FDA. Federal Regulations require that all adverse experiences (even with a marketed drug) be reported to the manufacturer who in turn must report them to the FDA. Of course, a physician may inform the FDA directly of these adverse reactions and experiences.

If Searle were truly engaged in defrauding FDA, it would presumably discourage all efforts to report adverse reactions. In-

---

**13.** Defendant contends that plaintiffs must meet their burden by a preponderance of evidence, citing *Cutco Industries v. Naughton*, 806 F.2d 361 (2d Cir.1986), and *Marine Midland Bank v. Miller*, 664 F.2d 899 (2d Cir.1981). As the court in *Marine Midland* noted, however,

> If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials. Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding

any controverting presentation by the moving party, to defeat the motion.

664 F.2d at 904. *See also Cutco*, 806 F.2d at 364. In the instant case, this Court has conducted no "full-blown evidentiary hearing." Therefore, even by defendant's own citations, plaintiff must only make a prima facie showing.

**14.** Plaintiffs' counsel suggests that Searle failed to inform the FDA of Copper–7's dangerousness to women with small uteri. However, in oral argument, plaintiffs' counsel recognized that the FDA had knowledge of Searle's plan to create a smaller Copper–7 better suited to these women. If Searle defrauded anyone, it was the doctors and patients who lacked access to the FDA documents—not the FDA.

stead, plaintiffs' proof substantially negates an allegation of fraud.

The remaining five documents make no mention of the FDA, but most appear to relate to expressions of opinion by various doctors during the extensive research relating to the product. Exhibit 13, although evoking the spirit of a conspiracy, has no relevance to Copper–7. Instead, as the recipient of Exhibit 13 later testified, the document most likely pertains to a different product, Aldactone.

Therefore, the Court concludes that Searle is not amenable to suit based on plaintiffs' allegations of fraud on the FDA. In light of the Court's rejection of plaintiffs' other bases for jurisdiction as well, the Court shall grant defendant's motion for dismissal in all relevant actions. A formal order will be entered in conformity with this Opinion.