Jerome W. BASS

v.

ENERGY TRANSPORTATION
CORPORATION.

Civ. No. K–91–1283.

United States District Court,
D. Maryland.

March 24, 1992.

Paul D. Bekman and Israelson, Salsbury, Clements & Bekman, Baltimore, Md., for plaintiff.

Douglas D. Connah, Jr., Cathy A. Chester and Venable, Baetjer & Howard, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, Senior District Judge.

On May 9, 1991, Bass instituted this suit against Energy Transportation Corporation (ETC) [1] under the Jones Act, 46 U.S.C.App. 688 (1988) and under general admiralty law for injuries which Bass sustained on board one of ETC's vessels, the S.S. LNG Aquarius, while employed by ETC as an unlicensed seaman. Plaintiff alleges that on February 11, 1989, when the S.S. LNG Aquarius was off the coast of Japan, he fell on his back while climbing down towards the deck, because the valve handwheel which he was gripping suddenly and

---

1. ETC is a Delaware corporation with its principal place of business in the State of New York. Plaintiff Bass is seemingly a citizen of the State of North Carolina. Thus, the forum connection in this case is apparently based solely upon defendant's contacts with the State of Maryland.

unexpectedly came loose from the valve bonnet. Plaintiff claims that the sole cause of his accident was ETC's negligence and failure to provide a safe and seaworthy vessel for its employees. ETC, responding to plaintiff's complaint, seeks dismissal because of lack of personal jurisdiction and/or of service, or alternatively, transfer pursuant to 28 U.S.C. § 1406(a) to the United States District Court for the Southern District of New York. Subsequently, the parties agreed that limited discovery concerning the issue of personal jurisdiction would be conducted, and that plaintiff's service of its within complaint upon ETC's resident agent in Delaware constituted appropriate and sufficient service. Accordingly, the sole issue now pending in this case is whether this Court has personal jurisdiction over ETC.[2] "When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989) (citations omitted). *See also McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

### FACTS [3]

ETC, a closely held corporation with no resident Maryland shareholders, is in the business of shipping liquid natural gas between Indonesia and Japan. ETC's vessels do not travel, and never have traveled, to or from the State of Maryland. Nor has ETC ever had any offices, sales representatives, employees or agents located in Maryland. ETC is not registered or qualified to do business in Maryland, does not operate or manage any ships in Maryland, and has no real or personal property, telephone listings, or bank accounts in Maryland. ETC has never filed suit in, or been held subject to the jurisdiction of, any state or federal court located in Maryland, has never authorized an agent to accept service of process in Maryland, and has never paid taxes to the State of Maryland. ETC has never solicited any, or advertised its, shipping business in Maryland. ETC hires all of its licensed marine personnel through the Marine Engineers' Benefit Association (MEBA), headquartered in Jersey City, New Jersey, either by reviewing resumes placed on file in ETC's New York office or by contacting the MEBA office in New Jersey.

ETC's only contact with Maryland is through its collective bargaining agreement and its fifteen-year ongoing relationship with the Seafarer's International Union (SIU), which maintains its principal office in Camp Springs, Maryland, and its "manpower pool" and training center at Piney Point, Maryland. ETC first entered into a collective bargaining agreement with SIU in 1976 or 1977. Although apparently not bound in each and every circumstance to hire all of its unlicensed personnel [4] pursuant to that agreement, ETC recognized SIU in that agreement as the "sole and exclusive bargaining representative of all Unlicensed Personnel employed on board and [sic] all American flag vessels now owned or operated by [ETC]." [5] Moreover, since 1977 ETC has in fact hired all of its unlicensed seamen through SIU. In turn, SIU under the agreement agreed to fill all of ETC's hiring needs.[6] The collective bar-

---

**2.** While defendant originally requested oral argument, counsel on both sides subsequently, after filing full written memoranda, stated that they did not desire to be heard orally.

**3.** The facts are seemingly not in dispute.

**4.** "Unlicensed personnel, as defined by the ETC–SIU Agreement, are seamen 'not holding a license issued by the United States Coast Guard to act as an officer on the LNG carrier registered under the laws of the United States.'" Nielsen Aff. ¶ 4. Steven M. Nielsen is the Marine Per-

sonnel Manager of ETC and has held that position since April, 1984.

**5.** Plaintiff's Opposition to Motion to Dismiss, Exhibit A at 1.

**6.** Under the collective bargaining agreement with ETC, SIU agreed to:

furnish the Company [ETC] with qualified, physically fit Unlicensed Personnel having the required ratings, when and where they are required and requested by the Company, who shall possess the ratings required to fill the

gaining agreement is quite extensive and sets forth details of ETC's employment relationship with its unlicensed seamen, including selection of personnel, wages, hours, medical benefits, working conditions, job descriptions and grievance procedures.

Typically in ETC's hiring process of unlicensed personnel, the ETC marine personnel office telephones to the SIU manpower pool in Piney Point, Maryland, at the beginning of each month and states ETC's anticipated needs for unlicensed crew for the next month.[7] The SIU manpower pool then recruits SIU seamen from all over the United States to fill ETC's hiring needs.[8] Within a week, the SIU manpower pool calls the ETC marine personnel office in New York with the names of seamen who will fill ETC's crew needs for the next month.[9] ETC forwards the identities of the seamen to its travel agent in New York City, which contacts the seamen directly to arrange for their transportation to Japan.[10] Pursuant to that hiring procedure, plaintiff Bass was dispatched from the SIU hiring hall in Norfolk, Virginia and was flown from Raleigh, North Carolina to Japan to board the LNG Aquarius.[11]

Since 1977 until the present, the ETC–SIU agreement has been renegotiated and renewed every three years.[12] The negotiations for the agreements in 1984, 1987, and 1990 took place at Camp Springs, Maryland, or Piney Point, Maryland.[13] ETC and SIU spent a couple of months negotiating each new agreement.[14] Those negotiations entailed regular phone calls, letter exchanges and several personal visits by ETC personnel to Maryland.[15]

The SIU not only provides unlicensed personnel for ETC, but also trains such personnel at Piney Point, Maryland.[16] After the training course is complete, each student seaman receives a certificate in the form of a seaman's card.[17] Although not all of the seamen hired by ETC through SIU are trained in Maryland, a substantial number of them do receive certification from Piney Point.[18]

Furthermore, ETC employees have visited the training center at Piney Point, Maryland to attend graduation ceremonies, to dedicate buildings for the training program, and to make monetary contributions.[19] Three or four times a year, ETC employees travel to Maryland to observe the training program and to suggest changes which would benefit ETC as opposed to other companies which hire seamen from SIU.[20]

---

Company's employment requirements; and if possible, such persons shall be obtained through Hiring Halls established by the Union [SIU] and administered by the Union. However, if the Union is unable to furnish such personnel to fill vacancies within the time required to insure the LNG carrier's scheduled sailing, the Company may, from whatever source, hire such persons as required to permit the LNG carrier to sail.

Plaintiff's Opposition to Motion to Dismiss, Exhibit A at 9.

7. Nielsen Aff. ¶ 12. Usually, ETC hires unlicensed seamen for four-month stints. *Id.*

8. *Id.* ¶ 13.

9. *Id.*

10. *Id.* ¶ 14.

11. *Id.* ¶ 15. Defendant claims that Bass' employment relationship with ETC was not formed until Bass signed the ship's Articles in Tobata, Japan on November 8, 1988.

12. Reilly Depo. at 12. George R. Reilly, the manager of marine labor relations for ETC, personally negotiated the 1987 and 1990 contracts between ETC and SIU.

13. *Id.* at 15–20; Campbell Aff. ¶ 4. Angus Campbell is the Vice President in Charge of Contracts and Contract Enforcement of SIU and personally negotiated the current ETC–SIU collective bargaining agreement. Defendants have presented no evidence that negotiations for any renewals of the bargaining agreement occurred outside of Maryland.

14. Reilly Depo. at 17.

15. *Id.* at 17–21; Campbell Aff. ¶ 3.

16. Reilly Depo. at 27.

17. *Id.* at 27–28.

18. *Id.* at 31.

19. *Id.* at 31–33, 40–41, 44.

20. *Id.* at 40–42.

## SUBJECT MATTER JURISDICTION AND VENUE [21]

■ Federal question subject matter jurisdiction is present in this Jones Act case, pursuant to 28 U.S.C. § 1331 (1988), and also under the Jones Act, 46 U.S.C.App. § 688 (1988), which provides in pertinent part:

(a) Application of railway employee statutes; jurisdiction

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; ... Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

In *Pure Oil Co. v. Suarez*, 384 U.S. 202, 203–04, 86 S.Ct. 1394, 1395–96, 16 L.Ed.2d 474 (1966), the Supreme Court stated that although the last sentence of 46 U.S.C.App. § 688(a) "is framed in jurisdictional terms, ... it refers only to venue," and that while "corporate residence traditionally meant place of incorporation," the term "residence" as used in the statute is to be construed in accordance with "the expanded general venue statute, 28 U.S.C. § 1391(c) (1964 ed.)." In so concluding, Justice Harlan wrote:

Although there is no elucidation from statutory history as to the intended effect of § 1391(c) on special venue provisions, the liberalizing purpose underlying its enactment and the generality of its language support the view that it applies to all venue statutes using residence as a criterion, at least in the absence of contrary restrictive indications in any such statute.... [T]here is nothing in the

legislative history of this provision of the Jones Act to indicate that its framers meant to use "residence" as anything more than a referent to more general doctrines of venue rules, which might alter in the future.

*Id.* at 205, 86 S.Ct. at 1396 (footnotes omitted). *See* 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed.Prac. and Proc. § 3818, at 173 (2d ed. 1986). As amended, § 1391(c) now reads in pertinent part:

(c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district *in which it is subject to personal jurisdiction at the time the action is commenced.*

(emphasis added).

For the reasons which are discussed *supra*, section 1391(c), as amended in 1988 prior to that 1989 accident alleged by Bass in this case, is deemed applicable herein. In sum, if personal jurisdiction exists in this case, venue exists. Also, as stated above, subject matter jurisdiction is present.

## PERSONAL JURISDICTION

■ The Jones Act does not contain a service of process provision. Accordingly, personal jurisdiction over a defendant in a federal question case under the Jones Act depends on the applicability of a state's long arm statute. FED.R.CIV.P. 4. *See Federal Insurance Co. v. Lake Shore, Inc.*, 886 F.2d 654, 657 n. 2 (4th Cir.1989). *See also* 4A Charles A. Wright & Arthur R. Miller, Fed.Prac. and Proc. § 1115, at 244–45, § 1075, at 495 (2d ed. 1987). In order for this Court to exercise personal jurisdiction over defendant, Maryland's long-arm statute must authorize and due process protections of the United States Constitution [22] must permit the exercise of that

---

**21.** Although the parties have not raised this issue, this Court now reviews it *sua sponte.*

**22.** In *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980), Justice White, in a diversity case, recognized that the Fourteenth Amendment's requirement of minimum contacts

perform[s] two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their

jurisdiction. Although Maryland law determines whether a section of the Maryland long-arm statute authorizes jurisdiction, federal law controls whether the exercise of that jurisdiction violates federal due process protections. *Catalana v. Carnival Cruise Lines, Inc.*, 618 F.Supp. 18, 20 (D.Md.1984), *aff'd*, 806 F.2d 257 (4th Cir. 1986) (citing *Craig v. General Finance Corp. of Illinois*, 504 F.Supp. 1033, 1036 (D.Md.1980)).

Section 6–103 of the Courts and Judicial Proceedings Article of the Maryland Code provides in pertinent part:

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A Court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

. . . .

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

. . . .

Maryland's highest court, its Court of Appeals, has interpreted the Maryland long-arm statute to extend to the limits permitted by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Krashes v. White*, 275 Md. 549, 341 A.2d 798 (1975). *See also Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551 (1977); *Geelhoed v. Jensen*, 277 Md. 220, 224, 352 A.2d 818 (1976); *A.S.C. Leasing, Inc. v. Porter*, 651 F.Supp. 384, 385 (D.Md.1987). Sections (b)(1) and (2) have been interpreted by this Court to be limited by section (a) to require that "some purposeful acts [be] performed by the defendant in Maryland in relation to one or more of the elements of the cause of action." *Malinow v. Eberly*, 322 F.Supp. 594, 599 (D.Md.1971). *See Catalana*, 618 F.Supp. at 20–21. The contacts listed in section (b)(4), however, need not arise from or relate to the plaintiff's cause of action. *Geelhoed v. Jensen*, 277 Md. 220, 232, 352 A.2d 818 (1976). *See also Catalana*, 618 F.Supp. at 21–22; *Greenwood v. Tides Inn, Inc.*, 504 F.Supp. 992, 996 (D.Md.1980). State and federal courts have drawn a distinction between specific jurisdiction, here (b)(1) and (2), and general jurisdiction, (b)(4).[23] When jurisdiction is asserted over a claim which does not arise out of a defendant's contacts with the forum state, the defendant's contacts with that forum must, in order to satisfy due process standards, be "continuous and systematic," *Helicopteros Nacionales de Colombia v. Hall*, 466

status as coequal sovereigns in a federal system.
Federalism concerns, however, seemingly, do not impact upon this federal question case in which only the Fifth, and not the Fourteenth, Amendment would appear implicated. *See Handley v. Indiana & Michigan Electric Co.*, 732 F.2d 1265, 1271 (6th Cir.1984); *North Carolina ex rel. Long v. Alexander & Alexander*, 680 F.Supp. 746, 750 (E.D.N.C.1988). But that does not significantly alter the inquiry as to whether the exercise by this Court in this case of personal jurisdiction would be unfair and unduly burdensome to defendant under the standards of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny. *See Long, supra*, at 750.

**23.** A court is said to exercise "specific jurisdiction" over a defendant when the suit arises out of or is related to the defendant's contacts with the forum state; a court is said to exercise "general jurisdiction" over a defendant when the suit does not so arise or relate to the plaintiff's suit. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 nn. 8 & 9, 104 S.Ct. 1868, 1872 nn. 8 & 9, 80 L.Ed.2d 404 (1984). "Even when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Id.* at 414, 104 S.Ct. at 1872.

U.S. 408, 415–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984), and " 'fairly extensive before the burden of defending a suit there may be imposed upon it without offending "traditional notions of fair play and substantial justice." ' " *Wolf v. Richmond County Hosp. Auth.*, 745 F.2d 904, 909 (4th Cir.1984) (quoting *Ratliff v. Cooper Lab., Inc.*, 444 F.2d 745, 748 (4th Cir.), *cert. denied*, 404 U.S. 948, 92 S.Ct. 271, 30 L.Ed.2d 265, *reh'g denied*, 404 U.S. 1006, 92 S.Ct. 561, 30 L.Ed.2d 559 (1971)), *cert. denied*, 474 U.S. 826, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985). Put another way, such contacts must be sufficiently extensive, continuous, and systematic in order to satisfy Maryland's (b)(4) statutory requirements of "overall fairness." *Goodyear Tire & Rubber Co. v. Ruby*, 312 Md. 413, 422–23, 540 A.2d 482 (1988).

■ Simply because, pursuant to its collective bargaining agreement with SIU, ETC hired SIU personnel, ETC would not appear thereby to have contracted "to supply goods, food, services or manufactured products in the State." Md.Cts. & Jud. Proc.Code Ann. § 6–103(b)(2) (1989). But as to (b)(1), the words "transacts any business" have been interpreted broadly "to include not only acts of commerce or transactions for profit, but acts which constitute a purposeful activity within the state." *A.S.C. Leasing, Inc. v. Porter*, 651 F.Supp. 384, 385–86 (D.Md.1987). In that light, ETC's bargaining agreement with SIU and its visits and monthly telephone calls to Maryland do amount to "purposeful activity" and a "persistent course of conduct" in Maryland. Thus, (b)(1) coverage is arguably present. But in any event, (b)(4) coverage is present without " 'offend[ing] traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

In *Camelback Ski Corp. v. Behning*, 312 Md. 330, 539 A.2d 1107, *cert. denied*, 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988), Maryland's highest court wrote with regard to the concepts of specific and general jurisdiction:

If, however, the facts of a given case do not naturally place it at either end of the spectrum, there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

312 Md. at 339, 539 A.2d 1107. Similarly, the Supreme Court of the United States has emphasized that

the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative.... Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws....

*International Shoe Co.*, 326 U.S. at 319, 66 S.Ct. at 160.

Bass' personal injury and suit certainly do not arise from or relate to the ETC–SIU agreement, to the same extent that they arise from an alleged accident off the shore of Japan. However, a cause of action under the Jones Act, unlike a general tort cause of action, requires the injury to occur in the course of employment by the defendant employer. Bass' employment contract, which has roots in and connections with the State of Maryland, does therefore relate "to one [if not] more of the elements of [his] cause of action." *Malinow*, 322 F.Supp. at 599. Furthermore, the ETC–SIU agreement itself, although not an individual employment contract between Bass and ETC, is an umbrella agreement which dictates in great detail the terms of the individual rights and obligations of Bass and of ETC and which causes individual employment contracts to be entered into by ETC. As such, the link between Bass' employment and the Union agreement appears considerably tighter than, for example, the solely "but for" causal relationship between a New Jersey casino owner's ad-

vertising and solicitation in Virginia and the responding Virginian plaintiff's slip and fall in New Jersey. *See Chedid v. Boardwalk Regency Corp.*, 756 F.Supp. 941, 943 (E.D.Va.1991).

Finally, even if it be assumed *arguendo* only that plaintiff's cause of action does not arise from or relate to ETC's contacts with Maryland, it does not necessarily follow that this Court lacks personal jurisdiction under (b)(4). *Helicopteros* is not to the contrary. In that case, United States citizens sued a Colombian corporation in a Texas state court for deaths caused by a helicopter crash in Peru. The accident was not related to the defendant's contacts with Texas—contacts which consisted mainly of defendant's regular purchases of helicopters, amounting to approximately 80% of its fleet, from a Texas corporation for a period of seven years. During those seven years defendant sent prospective pilots and management personnel to that Texas company for training and consultation. 466 U.S. at 410–11, 104 S.Ct. at 1870–71. The Supreme Court concluded that regular "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." *Id.* at 417, 104 S.Ct. at 1873. However, there is a qualitative difference between the purchasing of machines on a regular basis, as in *Helicopteros*, and ETC's hiring all of its unlicensed personnel every month for fifteen years in accordance with a detailed collective bargaining agreement which defines almost every detail of its employment relationship with such personnel, including wages, hours, medical benefits, working conditions, job responsibilities, and grievance procedures.[24] Simply put, ETC's hiring pursuant to its agreement with SIU entailed greater and more continuous responsibility on its part to the Union and to the latter's members than the regular purchasing, selling and/or advertising of goods usually involves. *See Nichols, et al. v. G.D. Searle & Company*, 783 F.Supp. 233 (D.Md.1992) and cases discussed and cited therein.[25] *See also S.A.S. Personnel Consultants, Inc.*, 286 Md. at 340, 407 A.2d 1139. That is particularly true because SIU did not merely broker unlicensed seamen for ETC's benefit, but trained a substantial number of those seamen as well. ETC indicated its own benefit from, and its own interest in, SIU's Piney Point, Maryland training facility by the regular trips of ETC personnel to Piney Point to survey the school's development, by ETC's suggestions of changes in training solely to benefit ETC's job qualification and training needs, by the attendance of ETC personnel at graduation and dedication ceremonies, and by ETC's monetary contributions.

In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), a Florida franchiser was able successfully to assert the personal jurisdiction of a Florida federal district court over a Michigan franchisee. While the franchise agreement provided that Florida law would govern with respect to controversies arising under it, that agreement did not contain a forum selection clause by which the franchisee agreed to be sued in Florida. Nevertheless, the Supreme Court held that the Michigan franchisee had a continuous, substantial relationship with Burger King's Florida-based operations and that the assumption of personal jurisdiction by the

24. *S.A.S. Personnel Consultants, Inc. v. Pat–Pan, Inc.*, 286 Md. 335, 340, 407 A.2d 1139 (1979), in which the Court of Appeals of Maryland wrote that "[t]he referral of potential employees by S.A.S. is analogous to the shipment of goods by a foreign manufacturer" concerned the words "doing business" in Sections 7–203(a) and 7–301 of the Corporations and Associations Article of the Maryland Code, which in some instances, require a foreign corporation first to qualify to do business in Maryland before it can maintain a suit as plaintiff in a Maryland Court—words which the Court stated were "not coterminous or synonymous with the term 'transacting any business' in § 6–103 of the Courts and Judicial Proceedings Article." 286 Md. at 338 n. 1, 407 A.2d 1139. In *S.A.S. Personnel Consultants, Inc.*, the Court held that a single personnel referral by a District of Columbia personnel referral company did not trigger the "doing business" effects of the qualification and suit-bringing Maryland statutes. In contrast, the activities of ETC in Maryland in this case were numerous, continuous and took place over a period of many years.

25. A copy of that opinion has been placed in the court file in this case.

Florida federal district court accordingly did not offend due process standards. In so concluding, Justice Brennan wrote:

> [T]he constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State.
>
> . . . .
>
> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.
>
> . . . .
>
> [A]n individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum ... Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction."
> ... It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.
>
> . . . .
>
> Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization.

471 U.S. at 474, 475, 478–79, 479–80, 105 S.Ct. at 2183, 2184, 2185–86, 2186 (citations omitted) (emphasis in original).

While ETC's relationship with the Union's Maryland facility falls short of the relationship of Burger King with the Michigan franchisee who was the defendant in *Rudzewicz*, ETC, like Rudzewicz, " 'reached out beyond' " its home state and developed a relationship in Maryland with SIU in order to have all of its monthly unlicensed personnel hiring needs fulfilled by a Union with an acceptable training program in Maryland. That relationship, in this Court's view, supports the conclusion that ETC "should reasonably [have] anticipate[d] being haled into court [in Maryland]," *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297, 100 S.Ct. at 567, and also supports the application of (b)(1) as well as (b)(4) of Maryland's long arm statute to ETC within the meaning of those statutes and without offense to the due process clause of the Fifth Amendment.

Accordingly, ETC's motion to dismiss or to transfer, because of lack of personal jurisdiction, will be denied in a separate Order entered today.

### ORDER

ETC's pending Motion to Dismiss or to Transfer is hereby denied. It is so ORDERED.